CLAYTON J. GRAHAM AND MARGARET D. GRAHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Graham v. Commissioner
Docket No. 21424-81.
United States Tax Court
T.C. Memo 1984-529; 1984 Tax Ct. Memo LEXIS 141; 48 T.C.M. (CCH) 1279; T.C.M. (RIA) 84529; October 3, 1984. Steven B. Nagler, for the petitioners. Thomas E. Ritter, for the respondent. SHIELDS MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1978 in the amount of $1,899.26. The only issue is whether petitioners are entitled to a deduction under section 164 [1] for the sales tax paid on certain materials used in the construction of a personal residence. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto *142 are incorporated herein by reference. Clayton J. Graham (hereinafter referred to as petitioner) and Margaret D. Graham, husband and wife, resided in Barrington Hills, Illinois, at the time they filed the petition in this case.Their joint income tax return for 1978 was prepared using the cash basis method of accounting and was filed with the Internal Revenue Service Center, Kansas City, Missouri. On the return, petitioners deducted sales taxes in the total amount of $8,936.30, of which amount $6,050.69 is in dispute. The disputed amount was incurred for part of the materials used in a residence constructed by petitioners in the manner set out below. In 1975 petitioners purchased for about $72,500 a building site for a new home. The site contained approximately five acres of land and sixteen acres of an adjoining lake. At the outset petitioner decided that because of his education and professional experience he was qualified to plan, supervise and manage the construction of the home. He also felt that he should closely supervise all of the construction because of certain unique features which he and his wife desired to incorporate into the house. Petitioner's education *143 included a Bachelor's Degree in Industrial Economics from Purdue University and a Master's in Economics from Roosevelt University. He also held an MBA and a Ph.D. from Northwestern University. His professional experience included five years as a management consultant with A.T. Kearney Company during which he had been extensively engaged in planning, scheduling and generally overseeing the construction of bulk distribution facilities for the Post Office Department as well as the Departments of Transportation and Defense. Using his education and experience, petitioner and his wife carefully planned the entire construction of their home before any work was commenced. For instance, they first examined about 70 or 80 of the homes already in the area in order to ascertain what type of building would be most suitable to the neighborhood and aesthetically pleasing to themselves and others. They talked to the owners of several of these houses and obtained from them recommendations with respect to available architects. From these recommendations they then chose Robert Parker Coffin as the architect for the building and a second firm as the architect for the landscaping of the site. *144 Over the next ten months Coffin prepared and petitioners reviewed between 75 and 100 sets of plans for the residence. During this period the landscape architect also presented petitioners with several sets of plans for the grounds. Petitioners met several times with both architects and the final plans contained many of petitioner's ideas and suggestions. When the architectural plans for the building were finalized, petitioner with the help of Coffin drew up a detailed set of separate specifications for each phase of the construction including excavation, concrete, iron and structural steel, masonry, carpentry, sheet metal, dry wall, ceramic tile, painting, plumbing, electrical, and heating. The building plans and specifications were then submitted to several local contractors for bids on all of the work required under the plans and specifications. The bids received from the contractors were carefully reviewed by Coffin and petitioner, not only with respect to the amount of the bids, but also with respect to the completeness of the compliance with the specifications. Based upon this review petitioners entered into an agreement with John C. Unruh on a standard construction *145 form prepared by the American Institute of Architects. This form was provided by Coffin and was completed by Coffin and petitioner. As executed, the agreement generally provided that all materials and labor for the aforesaid work would be furnished in accordance with the specifications by Unruh for the sum of $291,050, plus the cost of any extra work or materials approved by petitioner and less credits for certain work or materials covered by the agreement which the parties agreed would be performed or acquired by petitioner or by some other person or firm employed by him. The agreement further provided for payments by petitioners to Unruh on the tenth day of each month. Each monthly payment was to be based upon 90 percent of the contract sum properly allocable to labor, materials, and equipment incorporated in the construction or suitably stored at the site or at some other agreed upon location on the last day of the preceeding month. The plans and specifications for the work for which Unruh was to be responsible were incorporated into the agreement. Furthermore, the specifications for each phase of the work were made subject to certain general conditions which among *146 other things required Unruh to (1) have each subcontractor approved in advance in writing by petitioner and his architect; (2) keep an account of all sales taxes paid by Unruh for use by petitioner for income tax purposes; and (3) make no change in the plans or specifications without the written approval of petitioner. Construction of the residence commenced in July of 1977 and was completed in December of 1978. The total amount paid by petitioner to Unruh under the agreement was $361,278.13, after adjustments for extras and credits. The amount paid to Unruh represented about 25 percent of the total cost of about $1,500,000 for the project which included the landscaping, a geothermal heating and cooling system, a swimming pool, an irrigation system and several other substantial items covered by separate contracts between petitioner and the parties performing these jobs. During the construction, Unruh inspected the site about once a week. Coffin reviewed all construction work periodically and reported any deficiencies in the work to petitioner. Petitioner was on the site at least once every day and did not rely on Unruh to correct deficiencies but handled them himself *147 by direct contact with the subcontractors and suppliers. For example, when petitioner discovered a deficiency in certain brick work, he corrected the error by direct contact with the brick masons who were subcontractors employed by Unruh. On several other occasions petitioner corrected problems by direct contact with both subcontractors and suppliers. Under the agreement, Unruh had no authority to deviate from the plans and specifications without petitioner's prior approval but any additional cost from an approved deviation was to be borne by petitioner. Both petitioner and Unruh understood that petitioner was to be in complete control and have final authority over all phases of the construction and Unruh was to act for petitioner in purchasing materials and dealing with subcontractors. During the construction, payments made to Unruh and others for materials and labor were made from an escrow account which petitioner established with Chicago Title and Trust Company. From time to time petitionerwould instruct Unruh to purchase various materials for use in the construction which were not covered by the specifications. Unruh would purchase such materials and would *148 present documentation of the purchase to petitioner and would receive reimbursement for the purchase from the escrow account. In accordance with the agreement, Unruh paid all of the sales taxes on the materials purchased by him for petitioner, kept a record of the amount of such taxes, and was reimbursed in 1978 for such taxes by petitioner. The total of such taxes was $6,050.69. The portion of the construction in which Unruh was involved was completed in about six months. The residence contained about 4,500 square feet plus a full basement and one of its unique features was the fact that a portion of the energy needed for heating and cooling was provided by a geothermal system using the lake water. Unruh had no experience in the construction of this type of system and had to rely upon petitioner who designed an essential part of the system and used his expertise in this area to purchase the necessary materials and supervise its construction and installation. Petitioner also directly purchased many other materials for the project. He also negotiated with the plumbing subcontractor with regard to fixtures which had a retail cost of $11,153, with Northwest Mills for the *149 purchase of materials and services costing $56,525, and with H. E. Buck and Son with regard to cabinets and vanities costing about $20,000. All three of these subcontractors were employed by Unruh with the prior approval of petitioner and the amounts paid them including sales taxes of about $4,000 were paid through Unruh. Petitioner personally negotiated with Commonwealth Edison for the type and placement of the power lines bringing electric service to the residence. He also selected, retained, hired and supervised all of the subcontractors involved in the preparation of the land for the construction including the landscaping and all excavation for the residence, an irrigation system, and the geothermal system. Petitioner personally drew up all specifications for mill work, approved all shop drawings and supervised the finish work throughout the residence. He worked directly with Pella Window Company to design the windows for the house since this was one of the first homes in the United States in which triple glazed glass was used. Petitioner also directed the design and supervised the installation of the plumbing, roofing and interior decorations. Since he *150 was liable under the agreement for all overruns, petitioner assumed responsibility for the control of the costs on the project. In this connection he designed a computer program to aid in cost management which included detailed ledgers and other records reflecting the costs of the project on a daily basis. The deduction for sales taxes as claimed by petitioners on their 1978 return was computed as follows: General sales taxes from respondent's table
$ 888.10
Sales taxes on landscaping itesm
1,478.66
Sales taxes on home furnishings
518.85
Sales taxes on items purchased by Unruh
6,050.69
Total deduction claimed
$8,936.30
In his notice of deficiency respondent allowed the sales taxes on the landscaping and the home furnishings. He also allowed other sales taxes in the amount of $3,139.77 on purchases made by petitioners. Respondent, however, disallowed the deduction by petitioners of all of the $6,050.69 in sales taxes paid by Unruh although he concedes the correctness of this amount. Since the allowance of any part of the $6,050.69 would result in an overpayment by petitioners of their 1978 income tax, we granted their motion to conform *151 the pleadings to the proof. OPINION A state or local general sales tax on personal property purchased by a consumer for personal and not business use is deductible for income tax purposes by the consumer on the cash basis in the year in which the sales tax is paid. Section 164(a)(4). As a general rule, the sales tax must be imposed on and paid by the taxpayer claiming the deduction. Petty v. Commissioner,77 T.C. 482 (1981);Armentrout v. Commissioner,43 T.C. 16 (1964). However, even though the sales tax is imposed on the seller of the personal property, it will be treated for income tax purposes as being imposed on and paid by the consumer if the amount of the sales tax is separately stated and is paid by the consumer to the seller of the personal property. Section 164(b)(5). The parties agree that all of the sales taxes involved in this case are general sales taxes imposed upon a retail seller of personal property by the State of Illinois within the meaning of section 164(a)(4). They also agree that the sales taxes were separately stated and were paid to the seller of the personal property by Unruh. They disagree as *152 to whether such taxes qualify for treatment under section 164(b)(5) as being imposed upon and paid by petitioners. Respondent contends that the sales taxes in dispute were imposed upon and paid by Unruh as an independent contractor and represent part of the cost of the house to petitioners. Petitioners contend that under the facts and circumstances of this particular case Mr. Graham served as the general contractor in the construction of their residence and that Unruh was not an independent contractor but instead was Mr. Graham's agent and that the disputed sales taxes were incurred by Unruh as such agent and, consequently, the taxes in effect were imposed upon and paid by petitioners. For the reasons set out hereinafter, we agree with petitioners. Respondent has previously recognized thepossibility of a landowner qualifying to deduct local sales taxes on materials used in the construction of a personal residence by serving as his own general contractor. Rev. Rul. 58-292, 1958-1 C.B. 106. The same question has been considered by this Court. Petty v. Commissioner,77 T.C. 482 (1981). See also Underwood v. Commissioner,T.C. Memo. 1983-99 *153 and Richard v. Commissioner,T.C. Memo. 1983-183. From a close analysis of the above cases, it is apparent that in each case the key question is whether the builder is the agent of the owner or is an independent contractor. In Petty we stated: We begin with the well-established legal principle that an agency relationship has two essential ingredients: (1) The agent's express or implied authority to act for the principal, and (2) the principal's right to control the agent's conduct. * * * In the case at bar, the contractor was engaged to perform the work required by the contract documents; that is, to build a residence. The contractor agreed to, and in fact did, furnish workmen and materials and exercise his best skill and judgment in constructing the residence. Petitioners agreed to reimburse the contractor for its costs, including sales taxes, plus pay a contractor's fee. A fair inference can be drawn from these facts that the contractor was not controlled by petitioners, but used its own experience and judgment to carry out independently its duties under the contract. We note that the contract did not grant petitioners the right to control the *154 contractor in the performance of its duties therewith; neither did it grant the contractor the right to act in the name of petitioners. Moreover, there was no other reliable evidence to suggest that petitioners controlled, or had the right to control, the contractor in any meaningful respect. In addition, the contract stated that costs due to the negligence of the contractor or its agents were not reimbursable costs. The contract also provided for a maximum cost to the petitioners beyond which costs presumably would be absorbed by the contractor. Thus, not only did petitioners lack the requisite control but they also had limited liability, a factor that is uncharacteristic of a principal/agent arrangement. Based upon the foregoing, we are convinced that the contractor was not an agent of petitioners. [77 T.C. at 488-489.] In Richard v. Commissioner,supra, we relied upon our decision in Petty and concluded as follows: The written agreement between petitioners and Meyer [the builder] provides that Meyer will build a house meeting certain specifications. The agreement did not give petitioners the right to control Meyer, *155 but merely the right to change the specifications as construction proceeded. Pursuant to the agreement, Meyer furnished workmen and exercised his best skill and judgment in building the house. We conclude and hold from these facts that Meyer was not controlled by petitioners, but independently carried out his duties under the contract. Petty,supra at 489. The agreement also provides that Meyer will receive a fixed price, plus any increase due to modifications requested by petitioners. Any increase in the cost of materials or labor required for the house as originally specified would thus have been borne by Meyer. Petitioners thus had limited liability under their agreement with Meyer, a factor that is uncharacteristic of an agency relationship. Petty,supra at 489. [T.C. Memo. 1983-183, 45 T.C.M. at 1184, 52 P-H Memo. T.C. par. 83,183 at 83-707.] In Underwood v. Commissioner,supra, we refused to accept the Commissioner's contention that the builder was the consumer of the building materials as a matter of law solely because they were purchased in his name and that this precluded the *156 taxpayer from a sales tax deduction. We held that whether or not the taxpayer rather than the builder was the consumer of the materials depended upon a consideration of all of the facts and circumstances in the particular case. We refused, however, to adopt the taxpayer's contention that he was the actual contractor of the entire house because among other things the record indicated "that petitioner did not possess the expertise needed to be the contractor of the initial phases of the home's construction. Although petitioner may have been on the construction site and discussed the work being done with [the builder] it was [the builder] who controlled the work done in these initial phases of construction * * *." 45 T.C.M. at 782, 52 P-H. Memo. T.C. par. 83,099 at 330-83.
In the case before us, it is clear that petitioner had the education, previous experience and expertise to and did act as his own general contractor throughout all phases of the construction of the residence including the initial planning, site work, excavation, landscaping, power and energy, design and installation. From the record as a whole and from the testimony of both petitioner *157 and Unruh we have found that the plans and specifications prepared by petitioner with the help of his architects had to be followed by all of the subcontractors, including Unruh, and that petitioner had complete and absolute control over all of the subcontractors and suppliers at all times. He frequently met with the subcontractors and in fact designated which subcontractors and which suppliers were to be used on various phases of the construction. He was on the job site on a daily basis and controlled all aspects of the construction including the correction of errors which he handled directly with the particular subcontractor or supplier involved. From the record as a whole we have also found that petitioner had substantial experience in the construction business and in some respects particularly with respect to the geothermal system he had more expertise than Unruh. In fact, Unruh had no experience whatsoever in the construction of a residence with this type energy system. Petitioner helped design and draft and had the final authority over the adoption of the specifications for all of the construction work on the residence. He personally met with the suppliers *158 and chose not only the basis materials down to the type of nails used in the house, but such items as roofing design, plumbing fixtures and electrical conduit wires. From the record as a whole it is concluded that petitioner and not Unruh exercised full control and final authority over all aspects of the construction. Petitioner also paid a majority of the subcontractors directly for materials and labor. This is apparent by the fact that the total project cost over $1,500,000 and took over two years, while the portion in which Unruh was involved cost only about $350,000 and was completed in less than six months. In view of all of the foregoing, we are satisfied that on the record in this particular case petitioner acted as his own general contractor and employed and used Unruh strictly as an agent. Therefore, the sales taxes incurred in Unruh's name were incurred by him as agent for petitioner and are deductible by petitioners under section 164(b)(5). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, during the year in issue.↩